# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39969**

———————————

### UNITED STATES
*Appellee*

**v.**

### Anthony A. ANDERSON
Master Sergeant (E-7), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 25 March 2022

———————————

*Military Judge:* Willie J. Babor.

*Sentence:* Sentence adjudged 3 June 2020 by GCM convened at Ramstein Air Base, Germany. Sentence entered by military judge on 21 August 2020: Dishonorable discharge, confinement for 12 months, and reduction to E-1.

*For Appellant:* Major Jenna M. Arroyo, USAF; William E. Cassara, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Captain Cortland T. Bobczynski, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, RICHARDSON, and ANNEXSTAD, *Appellate Military Judges.*

Chief Judge JOHNSON delivered the opinion of the court, in which Judge RICHARDSON and Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of attempted sexual abuse of a child on divers occasions, in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1] Appellant elected to be sentenced by the military judge, who sentenced Appellant to a dishonorable discharge, 12 months of confinement for each specification to run concurrently, and reduction to the grade of E-1. The convening authority took "no action" on the sentence; however, he deferred the automatic forfeiture of pay and the adjudged reduction in grade until the entry of judgment, and waived the automatic forfeitures for a period of six months for the benefit of Appellant's spouse and dependent child. *See* Articles 57(b)(1) and 58b(b), UCMJ, 10 U.S.C. §§ 857(b)(1), 858b(b). The military judge entered the judgment of the court-martial.

Appellant raises six issues for our consideration on appeal: (1) whether the evidence is legally and factually sufficient to support his convictions; (2) whether the definition of "lewd act" as it relates to indecent conduct prohibited by Article 120b, UCMJ, 10 U.S.C. § 920b, impermissibly lowers the Government's burden of proof; (3) whether the military judge abused his discretion by admitting evidence under Mil. R. Evid. 404(b); (4) whether the military judge erroneously admitted the testimony of the Government's digital forensic expert witness in violation of the Confrontation Clause of the Sixth Amendment;[2] (5) whether Appellant was denied his right to a unanimous verdict in violation of the Sixth Amendment, the Fifth Amendment's[3] Due Process Clause, and the Fifth Amendment right to equal protection; and (6) whether Appellant is entitled to appropriate relief due to the convening authority's failure to take action on the sentence. We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

---

[1] References to Article 80, UCMJ, in relation to Specification 1 of the Charge, which alleged Appellant attempted to commit a lewd act on divers occasions between on or about 11 December 2018 and on or about 13 February 2019 by communicating indecent language, are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise indicated, all other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[2] U.S. CONST. amend. VI.

[3] U.S. CONST. amend. V.

## I. BACKGROUND

In the fall of 2018, Special Agent (SA) MN, an Air Force Office of Special Investigations (AFOSI) agent stationed in Germany, created the fictitious persona "Sara" for an undercover operation using Whisper, an Internet application that permitted users to post and send photos and messages anonymously. "Sara," as created by SA MN, was a 13-year-old female who lived on Ramstein Air Base (AB), Germany, with her single mother, an Air Force member.

Employing the user name "Sara_2005," on 1 December 2018, SA MN as "Sara" posted the following message on Whisper: "Moving sucks when u dnt have a b/f. #maninuniform #new2ramstein."[4] On 11 December 2018, "Sara" received the following message from Appellant employing the user name "ar_t-bone": "Hey Sara, let's chat and possibly catch a movie is things go well." "Sara" responded on the same day, and Appellant and "Sara" continued to exchange messages on Whisper. Appellant quickly revealed that he was 34 years old and stationed at Ramstein AB; in response to a question from Appellant, "Sara" told him that she was 13 years old. Rather than ending the exchange at that point, Appellant's next message asked "Sara" for a photograph of herself. When "Sara" replied "Lol, no!" Appellant asked her why she was using Whisper, and told her he used it "[f]or entertainment, to talk to chicks when they don't know anything about me."

On the same day he initially contacted "Sara," Appellant suggested that they "play a game" and sent her an image of a list of 46 questions. Some of the questions were innocuous, such as "age," "height," "favorite color," and "favorite movie;" however, a number of them were sexual in nature, for example, "When was the last time you had sex" and "What's your favorite sex position." Appellant explained to "Sara" that the "game" involved picking a question that the other person was required to answer. Through the game, Appellant asked "Sara" her height, what kind of underwear she was wearing, her relationship status, and whether she was a virgin.

As the message exchange continued, Appellant sent "Sara" a clothed head-and-shoulders photo of himself seated in a car. "Sara" replied, "U look so mature." In return, "Sara" sent Appellant a clothed photo of herself which was in reality an age-regressed photo of a 25-year-old woman. In addition to being digitally modified to make "Sara" appear younger, the photo had a filter applied to give "Sara's" face two ears and a nose similar to a teddy bear. After receiving "Sara's" photo, Appellant replied, "It's really you? Your super cute," and later, "Well it's what I really think [ ] You look more mature."

---

[4] The Whisper messages quoted in this opinion are reproduced verbatim without attempting to correct or identify abbreviations or errors in spelling and grammar.

Later in their exchanges, Appellant asked "Sara" several additional sexually-oriented questions. Among other questions and comments, Appellant asked "Sara" whether she had kissed a boy, and told her, "French kissing is fun." He asked whether "Sara" masturbated and whether it felt "good" when she did. Appellant sent "Sara" a chart of 21 cartoon-style images of women with bare breasts of different shapes, and he asked "Sara," "Which one are you?" He also asked "Sara" if she let her supposed ex-boyfriend touch her breasts.

During their communications, Appellant revealed that he was in the Air Force and worked in aircraft maintenance. He further revealed that he was married. After "Sara" agreed with Appellant that "Sara's" mother would be angry if she knew about their Whisper conversations, Appellant proposed he and "Sara" "both will promise to keep it a secret."

On 18 December 2018, after a week of messages, "Sara" initiated the following exchange:

["Sara":] Hey, so this is real hard 4 me 2 say but idk if we shuld talk n e more. U seem real nice an all but I'm lookin 4 a b/f 2 go 2 movies w/ an stuff. An I no ur weirded out cuz I'm 13

[Appellant:] Sorry I was asleep. [ ] If that's what you want to do that's fine. [ ] I just figured we could talk till you got a bf then we can stop. How about that?

["Sara":] I meen, I guess that's ok. I jus kind of want a bf 2 go 2 movies an stuff w/

["Sara":] And I meen I no u wuldnt want 2 date me cuz I'm 13

[Appellant:] Yea I know you want to find someone to go to the movies with. [ ] We can talk but I can get into a lot of trouble for hanging out with you. Espiecally in public

The exchanges continued, and at a later point Appellant suggested they might be able to meet in person sometime in the future. Appellant also repeatedly requested additional photos of "Sara." On 20 January 2019, Appellant sent "Sara" a photo of himself taken in a mirror with his face obscured, wearing only underwear through which the outline of his penis was visible. Appellant subsequently told "Sara," "I'd love to see you the same way too." "Sara" responded, "Like w/ my shirt off?" to which Appellant replied, "Sure but not naked though." "Sara" told Appellant she would not take her shirt off, but would send him another photo. "Sara" re-sent Appellant the same age-regressed and filtered photo she sent before, and then sent him a different fully clothed age-regressed photo of the same woman holding a cat. Appellant asked "Sara" if she wanted another photo of him, to which she replied "Sure." Appellant then

sent "Sara" another photo similar to his previous one, wearing only underwear and with the shape of his penis clearly visible through the fabric.

Appellant subsequently wrote, "I'd like to show you more but then I could go to jail lol." When "Sara" asked what he meant, Appellant responded, "Cuz your underage and if anyone finds out I can be in trouble [ ] For showing you my naked pics [ ] Or if you show me anything naked too." However, Appellant continued to ask for more photos of "Sara," including requests to see what was "under [her] sweater" and of "Sara" wearing her bra. After "Sara" expressed concern that Appellant might be "a cop," at her request Appellant sent her a photo of his face next to a piece of paper with "Hi Sara" written on it.

SA MN was able to identify Appellant by showing his photograph to the first sergeants of the maintenance squadrons at Ramstein AB. The message exchanges on Whisper continued until 13 February 2019, when AFOSI agents apprehended Appellant at his duty location. The AFOSI seized Appellant's phone, and subsequent forensic analysis recovered the messages and photos Appellant had exchanged with "Sara" on Whisper.

The AFOSI recovered additional relevant information from Appellant's phone that was subsequently admitted as evidence in his trial. On 10 December 2018, the day before he first contacted "Sara," Appellant viewed an Internet article entitled "13 popular new apps teens are using," which described Whisper as an application where users "post random or deeply private thoughts" which "are often sexual," and "also has a 'Meet Up' section." In addition, the AFOSI discovered that on 11 and 12 February 2019, Appellant contacted and exchanged Whisper messages with a user known as "Kittycat" who had posted the message, "Who goes to Ramstein High School?" Appellant asked "Kittycat" if she was "into guys older than [her]." After "Kittycat" told Appellant she was 15 years old, Appellant continued sending her messages, exchanged clothed photos with her, sent her the same image with 46 questions that he had sent to "Sara," and suggested they play the same "game." When "Kittycat" indicated she was not interested in the game because she had a boyfriend, Appellant told her "It's ok" because her boyfriend "won't know." The AFOSI subsequently identified "Kittycat" as an actual 15-year-old female high school student at Ramstein AB.

Appellant was charged with two specifications of attempted sexual abuse of a child with regard to his communication with "Sara." He was not charged in relation to his communication with "Kittycat."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

"We review issues of legal and factual sufficiency de novo." *United States v. Knarr*, 80 M.J. 522, 528 (A.F. Ct. Crim. App. 2020) (citation omitted), *rev. denied*, 80 M.J. 348 (C.A.A.F. 2020). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *Id.* (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, the "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (internal quotation marks and citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Knarr*, 80 M.J. at 528 (alterations in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

In order to find Appellant guilty of attempted sexual abuse of a child in violation of Article 80, UCMJ, as alleged in Specification 1 of the Charge, the court members were required to find the following beyond a reasonable doubt: (1) that on divers occasions between on or about 11 December 2018 and on or about 13 February 2019, in or near Germany, Appellant did a certain overt act, that is, intentionally communicated indecent language to "Sara" via communication technology, with the intent to gratify his sexual desires; (2) that the act was done with the specific intent to commit a certain offense under the UCMJ,

specifically, sexual abuse of a child in violation of Article 120b, UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 4.b. The attempted offense, sexual abuse of a child in violation of Article 120b, UCMJ, 10 U.S.C. § 920b (2016 *MCM*), required the commission of a "lewd act" on a child under the age of 16 years. *See* 2016 *MCM*, pt. IV, ¶ 45.a.(c). In this context, a "lewd act" included, *inter alia*, "intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person." 2016 *MCM*, pt. IV, ¶ 45b.a.(h)(5)(C). "'Indecent' language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts." 2016 *MCM*, pt. IV, ¶ 89.c.

In order to find Appellant guilty of attempted sexual abuse of a child as alleged in Specification 2 of the Charge, the court members were required to find the following beyond a reasonable doubt: (1) that on divers occasions between on or about 20 January 2019 and on or about 22 January 2019, in or near Germany, Appellant did a certain overt act, that is, intentionally displayed his genitalia through his clothing in the presence of "Sara" via communications technology; (2) that the act was done with the specific intent to commit a certain offense under the UCMJ, specifically sexual abuse of a child in violation of Article 120b, UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 4.b. As with Specification 1, sexual abuse of a child in violation of Article 120b, UCMJ, 10 U.S.C. § 920b, required the commission of a "lewd act" on a child under the age of 16 years. *See MCM*, pt. IV, ¶ 62.a(c). For purposes of Specification 2, the relevant definition of a "lewd act" included, *inter alia*,

> any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology, that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.

*MCM*, pt. IV, ¶ 62.a.(h)(5)(D).

Rule for Courts-Martial (R.C.M.) 916(g) states: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." Applying

what has been called the "subjective" test for entrapment, the defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992).[5] Once raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.* (citations omitted). "Inducement" means more than merely providing the means or opportunity to commit a crime; the Government's conduct must "create[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Howell*, 36 M.J. 354, 359 (C.M.A. 1993) (internal quotation marks and citations omitted).

**2. Analysis**

Appellant contends the evidence is legally and factually insufficient to support his conviction of either Specification 1 or Specification 2 of the Charge. We disagree. The Government introduced convincing evidence for each specification.

### *a. Sufficiency of the Evidence Generally*

With regard to Specification 1, the Government proved Appellant sent a series of sexually provocative messages to "Sara," who he believed to be a 13-year-old child. Although the specification did not recite the allegedly indecent language from Appellant's messages, the military judge's instructions provided to the court members the particular language upon which the specification was based.[6] That language is directly supported by the messages exchanged be-

---

[5] In addition to the "subjective" test for entrapment, military appellate courts have recognized an "objective" test whereby a court may find the Government's conduct so outrageous or shocking to the judicial conscience that it violates an accused's right to due process under the Fifth Amendment, and thereby constitutes entrapment as a matter of law. *United States v. Berkhimer*, 72 M.J. 676, 679–80 (A.F. Ct. Crim. App. 2013). Appellant does not contend, and we do not find, the facts of the instant case implicate "objective" entrapment.

[6] Specifically, the military judge instructed that the charged indecent language consisted of the following:

> The accused sending "Sara" the number game; asking "Sara" what kind of underwear she had on; asking if "Sara" was a virgin; asking when "Sara" last masturbated; asking "Sara" if masturbation felt good to her;

tween Appellant and SA MN as "Sara," which were also recovered from Appellant's phone. There is no question as to Appellant's identity as Whisper user "ar_t-bone." A reasonable factfinder could conclude that, under the circumstances, Appellant's messages to someone he believed to be a 13-year-old girl were indecent and communicated with the intent to gratify his sexual desires.

With regard to Specification 2, the Government proved Appellant sent "Sara" two different photos of himself displaying his penis through his underwear. Again, there is no question about the identity of Appellant as the sender. In addition, the Government provided ample proof that the photos Appellant sent were of himself. Although Appellant's face is not visible in the photos, Appellant told "Sara" the images were of him. In addition, the visible skin tone generally matches Appellant's, and a tattoo on one arm partially visible in both photos matches a distinctive tattoo on Appellant's arm in a photo AFOSI agents took and that the Government entered into evidence. Furthermore, the distinctive coloration and bathroom furnishings visible behind the figure in the photos matches those photographed in Appellant's residence. Although the penis is not exposed, its shape is discernible under the clothing and prominent in the photo. A reasonable factfinder could conclude Appellant's conduct in sending such images to someone he believed to be a 13-year-old girl was indecent in that it "amount[ed] to a form of immorality relating to sexual impurity which [was] grossly vulgar, obscene, and repugnant to common propriety, and tend[ed] to excite sexual desire or deprave morals with respect to sexual relations." *See MCM*, pt. IV, ¶ 62.a.(h)(5).

With regard to each of the specifications, a reasonable fact-finder could conclude beyond a reasonable doubt Appellant committed the charged overt acts, beyond mere preparation, with the specific intent to commit the offense of sexual abuse of a child in violation of Article 120b, UCMJ, and which apparently tended to effect the commission of the offense.

On appeal, Appellant raises two specific arguments challenging the sufficiency of the evidence: first, that he was entrapped; and second, specifically with regard to Specification 1, that the Government failed to prove that he intended to gratify his sexual desires. We address each argument in turn.

asking for descriptions of "Sara's" breasts; telling "Sara" he was in his underwear; asking "What are you wearing?" and including a flirtatious "winking" emoji; asking for pictures of "Sara" in a sports bra; and asking if "Sara" needs him to "warm her up."

Appellant was on notice that these specific messages formed the basis for the specification; the specific language cited by the military judge mirrored the Government's bill of particulars, provided to the Defense on 27 May 2020.

### b. Entrapment

At trial, the military judge instructed the court members on the defense of entrapment. The court members evidently found this defense did not apply to Appellant's actions; neither do we. The evidence supports finding beyond a reasonable doubt that the criminal design did not originate with the Government, and even if it had, that Appellant was predisposed to commit the offenses.

"The essence of entrapment is an improper inducement by government agents to commit the crime." *Wheeler*, 76 M.J. at 574 (citing *Howell*, 36 M.J. at 359). "Such improper inducement does not exist if government agents merely provide the opportunity or facilities to commit the crime." *Id.* In this case, SA MN merely provided Appellant the opportunity to commit the offense through the persona of "Sara." It was consistently Appellant who turned the conversation to sexual subjects. For example, Appellant initiated the "game" involving the list of 46 questions, which he used to ask "Sara" about her underwear and sexual experience; he sent "Sara" the breast chart to ask about the shape of her breasts; he asked whether she masturbated; and he sent her two photos with the shape of his penis visible through his underwear. Appellant contends SA MN's initial Whisper post targeted active duty Air Force members with "#maninuniform," but that is hardly an improper inducement to send sexual messages to a child after being informed "Sara_2005" was a 13-year-old girl. Nor does the fact that "Sara" continued to exchange messages with Appellant and sent the first message on certain days demonstrate an improper inducement. SA MN did not ask sexual questions of Appellant, even as part of the "game," and did not solicit sexual photos from him. Appellant could have easily ceased communicating with SA MN at any point, or refrained from injecting sexually-charged content in his messages to her.

Furthermore, assuming *arguendo* that the criminal design did originate with the Government, the evidence supports the court members finding beyond a reasonable doubt that Appellant was predisposed to commit the offense. An accused who commits an offense without an extraordinary inducement from a Government agent to do so demonstrates a predisposition to commit the offense and is not the victim of entrapment. *Whittle*, 34 M.J. at 208 (citations omitted). For entrapment to exist, the government conduct must:

> create[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense . . . [and  may take the form of] pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Wheeler*, 76 M.J. at 574–75 (alterations in original) (quoting *Howell*, 36 M.J. at 359–60). "Sara" provided Appellant no such extraordinary inducements in this case. Moreover, Appellant's messages to "Kittycat," who (accurately) identified herself as a 15-year-old girl, including Appellant's attempt to initiate with "Kittycat" the same 46-question "game" he played with "Sara," are powerful evidence he was predisposed to such behavior and not entrapped by SA MN.

Embedded in his argument that he was entrapped, Appellant contends he did not actually believe "Sara" was 13 years old. He argues that SA MN used odd language that a 13-year-old would not use, such as "#maninuniform;" that "Sara" sent numerous messages at times when she should have been in school; and that the two age-regressed photos SA MN sent Appellant were "obviously doctored." We are not persuaded "Sara's" language was significantly implausible for a 13-year-old girl, and we do not find it unlikely that a middle school student would find opportunities to send text messages while at school. How genuine the photos appear may be a matter of opinion, but more importantly, Appellant's messages provide no substantial indication that he doubted "Sara" was 13 years old. On the contrary, he asked "Sara" to hide their correspondence from her mother; warned her not to send him nude pictures because it would be illegal; and explained he did not want to meet her in person because he could "get into a lot of trouble for hanging out with [her]." Appellant cites his comment that "Sara's" photo looked "more mature," but this comment—which echoes "Sara's" prior statement that Appellant looked "so mature"—can readily be interpreted as an effort to compliment "Sara" and make her more comfortable with their communications.[7] At no point in his messages did Appellant suggest he doubted "Sara" was who she said she was.

### c. Intent to Gratify Sexual Desires

Appellant contends the Government failed to prove beyond a reasonable doubt that the indecent language he sent "Sara" was intended to gratify his sexual desires. However, Appellant does not suggest a non-sexual reason why he would ask "Sara" what kind of underwear she was wearing, what her breasts were like, whether she masturbated, et cetera. Instead, he emphasizes that he did not solicit nude photos from "Sara," discuss sexual acts they could perform together, attempt to meet with her, or escalate the level of their interactions in other ways. However, Appellant's own messages indicate this reluctance was significantly motivated by his fear of "get[ting] into a lot of trouble" because of "Sara's" age, rather than an absence of sexual interest. More generally, evidence that Appellant was willing to engage in some forms of sexual abuse of a child but not in other sexual offenses does not disprove his sexual intent or his guilt. A reasonable finder of fact could easily conclude beyond a

---

[7] Relevantly, Appellant also told "Kittycat" that she looked older than 15 years.

reasonable doubt that Appellant sent indecent messages to "Sara" for the purpose of gratifying his sexual desires.

### d. Conclusion as to Legal and Factual Sufficiency

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt and find his convictions factually sufficient. *See Turner*, 25 M.J. at 325.

## B. Mens Rea for Indecent Conduct Under Article 120b, UCMJ

### 1. Law

Whether the military judge correctly instructed the court members is a question of law we review de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citation omitted). The constitutionality of a statute and the mens rea requirement applicable to a particular offense are also questions of law reviewed de novo. *United States v. Gifford*, 75 M.J. 140, 142 (C.A.A.F. 2016) (citations omitted); *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012) (citation omitted). However, "[f]ailure to object to an instruction or to omission of an instruction before the members close to deliberate forfeits the objection." R.C.M. 920(f). We review forfeited issues for plain error. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citation omitted). In a plain error analysis, the appellant "has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (footnote and omitted omitted).

In addition, where an appellant "affirmatively declined to object to the military judge's instructions and offered no additional instructions," he may thereby affirmatively waive any right to raise the issue on appeal, even "in regards to the elements of the offense." *Davis*, 79 M.J. at 331 (citations omitted). "However, in *Davis*, [the Court of Appeals for the Armed Forces (CAAF)] noted that [it] review[s] a matter for plain error when there is a new rule of law, when the law was previously unsettled, and when the [trial court] reached a decision contrary to a subsequent rule." *United States v. Schmidt*, ___ M.J. ___, No. 21-0004, 2022 CAAF LEXIS 139, at *10–11 (C.A.A.F. 11 Feb. 2022) (fourth alteration in original) (internal quotation marks and citations omitted). "Whether an appellant has waived an issue is a legal question we review de novo." *Id.* at *8–9 (citations omitted).

As discussed above with regard to the sufficiency of the evidence, Specification 2 alleged Appellant attempted to commit the offense of sexual abuse of

a child, in violation of Article 120b, UCMJ, 10 U.S.C. § 920b, by committing a "lewd act" upon "Sara," specifically, by intentionally displaying his genitalia through his clothing in her presence via communications technology. For purposes of Specification 2, the relevant definition of a "lewd act" included, *inter alia*,

> any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology, that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.

*MCM*, pt. IV, ¶ 62.a.(h)(5)(D).

"In determining the mens rea applicable to an offense, we must first discern whether one is stated in the text, or, failing that, whether Congress impliedly intended a particular mens rea." *United States v. McDonald*, 78 M.J. 376, 378–79 (C.A.A.F. 2019) (citation omitted). "[T]he existence of a mens rea is presumed in the absence of clear congressional intent to the contrary." *Id.* at 379 (citing *United States v. Haverty*, 76 M.J. 199, 203–04 (C.A.A.F. 2017)). "[A] general intent mens rea is not the absence of a mens rea, and such offenses remain viable in appropriate circumstances post-*Elonis*." *Id.* (citing *Elonis v. United States*, 575 U.S. 723, 736 (2015)). A general intent offense implies a mens rea that the accused intentionally committed the charged act. *Id.* at 381.

### 2. Analysis

As clarified by his reply brief, Appellant contends that Article 120b, UCMJ, is unconstitutional to the extent that the definition of a "lewd act" permits conviction for indecent conduct according to an objective standard, and without requiring proof that the accused acted with subjective intent with respect to indecency. Appellant contrasts Specification 1, which as charged required the Government to prove he communicated indecent language to "Sara" with the specific intent to gratify his sexual desires, with Specification 2, which required that the alleged *conduct* be intentional but meet an *objective* standard of immorality as determined by the court members, without any requirement to prove Appellant's subjective intent to gratify sexual desires. Appellant relies on *Elonis*, where the United States Supreme Court overturned a conviction based on an erroneous jury instruction "that the Government need prove only that a reasonable person would regard [the petitioner's] communications as threats." 575 U.S. at 740. Doing so, the Court noted, would effectively create a mens rea of negligence based on an objective standard. *Id.* Accordingly, Appellant contends this court should set aside the finding of guilty as to Specification 2.

However, as an initial matter we must address whether, as the Government contends, Appellant waived this issue when trial defense counsel told the military judge the Defense did not have any objection with regard to the court member instructions on the elements of Specification 2. *See Davis*, 79 M.J. at 331 (citations omitted). Appellant has not specifically addressed this point. In order to answer this question, we must consider whether the situation in Appellant's trial was more analogous to *Davis*, where the CAAF applied waiver, or to its recent decision in *Schmidt*, where it did not.

In *Davis*, the CAAF held the appellant "expressly and unequivocally acquiesce[ed]" to the military judge's findings instructions when the defense "affirmatively declined to object [twice] and offered no additional instructions." 79 M.J. at 331 (citations omitted). Similarly, in the instant case, before the military judge provided the findings instructions to the court members, the civilian trial defense counsel agreed that the instructions were "a correct statement of law." In addition, after the military judge read the instructions to the court members he asked the parties if there were any objections or requests for additional instructions; the civilian trial defense counsel responded, "No, Your Honor."

In *Schmidt*, Judge Sparks, announcing the opinion of the court,[8] acknowledged trial defense counsel "assented" to the legal definition the military judge provided the court members, which the appellant subsequently challenged on appeal. *Schmidt*, 2022 CAAF LEXIS 139, at *10. Although "[i]n light of *Davis*, this affirmative declination to object to the military judge's definition . . . would appear to waive [the appellant]'s right to challenge that definition on appeal," Judge Sparks explained the defense's "failure to object was not waiver given the unsettled nature of the law" at the time of the trial with respect to the specific definition at issue. *Id*. at *11. Accordingly, Judge Sparks reviewed the challenged instruction for plain error. *Id*. at *11–15.

Returning to the instant case, similar to *Davis*, and contrary to his argument on appeal, Appellant affirmatively acquiesced in the military judge's definition of the elements of attempted sexual abuse of a child by indecent conduct in violation of Article 120b, UCMJ, as alleged in Specification 2. Therefore, applying *Davis* in light of *Schmidt*, the question becomes whether the legal point Appellant now asserts on appeal was "unsettled" in a manner similar to the definition at issue in *Schmidt*. On one hand, the language of the statute appears clear, and Appellant cites no decision by the CAAF, by this court, or

---

[8] Judge Sparks's opinion was not joined by any other judge. However, Chief Judge Ohlson writing separately and concurring in the judgment, joined by Senior Judge Erdmann, "agree[d] with Judge Sparks that this is not a waiver case." *Schmidt*, 2022 CAAF LEXIS 139, at *15–16 (Ohlson, C.J., concurring in the judgment).

by our sister Courts of Criminal Appeals that suggests the objective standard for indecency under Article 120b, UCMJ, may be unconstitutional. *Cf. United States v. Miller*, No. ACM 39747, 2021 CCA LEXIS 95 (A.F. Ct. Crim. App. 3 Mar. 2021) (unpub. op.) (affirming convictions for attempted sexual abuse of a child by indecent conduct), *rev. denied*, 81 M.J. 334 (C.A.A.F. 2021). However, we have not found "binding precedent" applying *Elonis* to the objective standard of indecency in Article 120b, UCMJ, as Appellant now seeks to do. *See Schmidt*, 2022 CAAF LEXIS 139, at \*11. Recognizing our authority under Article 66, UCMJ, 10 U.S.C. § 866, to pierce waiver in order to ensure an appellant has not been unfairly prejudiced by a legal error, we will assume, without deciding, that Appellant forfeited rather than waived this issue. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (citing *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001)).

Reviewing Appellant's claim for plain error, we find Appellant is entitled to no relief. Questions of statutory construction begin with the language of the statute. *McDonald*, 78 M.J. at 379 (citation omitted). *Elonis* explained that "[w]hen interpreting federal criminal statutes that are silent on the required mental state, we read into the statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct." 575 U.S. at 736 (internal quotation marks and citations omitted). Moreover, courts "'must give effect to the clear meaning of statutes as written' and questions of statutory interpretation should 'begin and end . . . with [statutory] text, giving each word its ordinary, contemporary, and common meaning.'" *United States v. Andrews*, 77 M.J. 393, 400 (C.A.A.F. 2018) (alterations in original) (quoting *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017)). The statute challenged in *Elonis* expressly provided for a "reasonable person" standard with respect to the definition of a "true threat," effectively applying a negligence standard with regard to the content of the communication. 575 U.S. at 731. In contrast, Article 120b(h)(5)(D), UCMJ, at issue in the instant case, provides a definition for indecency that does not rely on a reasonable person standard. Thus, we find that in the absence of any defense objection, a military judge would not "plainly" or "obviously" conclude *sua sponte* that Article 120b, UCMJ, was unconstitutional in light of *Elonis*. Furthermore, we find the statute's requirement that the conduct be intentionally performed with or in the presence of a child under the age of 16 years, coupled with the requirement that the conduct be "indecent" and actually "tend[ ] to excite sexual desire or deprave morals with respect to sexual relations," sufficiently separates wrongful conduct from otherwise innocent conduct. Accordingly, we find Appellant has failed to demonstrate plain or obvious error.

## C. Mil. R. Evid. 404(b)

### 1. Additional Background

On 1 May 2020, a month before Appellant's trial, the Government provided the Defense written notice in accordance with Mil. R. Evid. 404(b) that it might seek to introduce evidence of the following acts: (1) that Appellant "sent the same breast chart cartoon and 'pick a number game' to multiple users on the Whisper chat application," as evidence of a common scheme or plan; (2) that Appellant "sent the same clothed image of himself to both [SA MN] as he did to a Whisper user identified as '[K]ittycat' who told [Appellant] she was fifteen" and who "was later identified as a fifteen year old Ramstein high school student," as potential rebuttal evidence; and (3) that Appellant "spoke with a user [on Whisper] who identified herself as a 17 year old and [Appellant] asked her for 'sexy' pictures," also as potential rebuttal evidence.

On 26 May 2020, less than a week before Appellant's trial, the Government provided additional Mil. R. Evid. 404(b) notice regarding searches Appellant performed on a particular website, and evidence Appellant exchanged messages and photos with two additional Whisper users, as evidence of Appellant's intent, "knowledge" that "Sara" was a child, absence of mistake, and the existence of a common scheme or plan.

At trial, after opening statements, the Defense submitted a motion to exclude the evidence referred to in the Government's 26 May 2020 notice on the grounds that it was untimely, that the Government provided insufficient information regarding the specifics and context of the noticed evidence, and that any probative value would be substantially outweighed by the danger of unfair prejudice. The Government submitted a written opposition to the defense motion with several attachments, including the AFOSI Report of Investigation (ROI).

The military judge held a hearing on the motion at which he received argument from counsel. The scope of the hearing expanded to address the admissibility of the evidence identified in the Government's 1 May 2020 notice as well as the 26 May 2020 notice. At the conclusion of the hearing, the military judge issued an oral ruling which he subsequently supplemented in writing. With respect to the 1 May 2020 notice, the military judge noted the Government had "withdrawn" its use of evidence that Appellant sent the "breast chart cartoon" and "pick a number game" to multiple Whisper users, as well as evidence Appellant requested "sexy pictures" from a Whisper user who described herself as 17 years old, and that such evidence was "not admissible without further notice." The military judge further noted the Government had withdrawn the use of evidence that Appellant sent the same clothed image of himself to "Kittycat" that he had sent to "Sara." However, he ruled that evidence Appellant

communicated with a Whisper user identified as "Kittycat" who told Appellant she was 15 years old, and was in fact a 15-year-old high school student, was relevant and admissible to show the existence of a common plan or scheme and to show Appellant's intent in his communications with "Sara," and its probative value was not substantially outweighed by the danger of unfair prejudice. In addition, the military judge excluded the evidence identified in the 26 May 2020 notice because the notice was untimely and not in compliance with the military judge's scheduling order.

After trial defense counsel cross-examined the Government's first witness, SA MN, the Government requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing. There, trial counsel argued the Defense had opened the door to several matters in the 1 May 2020 Mil. R. Evid. 404(b) notice. Trial counsel pointed to questions the Defense had asked which suggested Appellant may have believed "Sara" was actually an adult, such as the number of times SA MN had sent messages to Appellant on Whisper when a 13-year-old would have been at school, and the fact that the person depicted in the age-regressed photos SA MN sent Appellant was actually 25 years old. The military judge agreed with trial counsel that the door had been opened, and further indicated he believed the issue of entrapment had been raised. The military judge permitted the Government to introduce evidence of the entirety of the Whisper conversation between Appellant and "Kittycat." However, the military judge continued to exclude evidence addressed in the 26 May 2020 Mil. R. Evid. 404(b) notice.

The military judge subsequently issued a supplemental written ruling on the Defense's motion to exclude Mil. R. Evid. 404(b) evidence. The ruling held that evidence Appellant communicated on Whisper with "Kittycat," who identified herself as 15 years old and was later identified as an actual 15-year-old high school student, was admissible as evidence of a common scheme or plan, of Appellant's intent, and to rebut the defense of entrapment. However, the ruling did not specifically address the substance of the communications between Appellant and "Kittycat." The ruling also reiterated that the Government had withdrawn its use of the other evidence addressed in its 1 May 2020 Mil. R. Evid. 404(b) notice, and that the motion to exclude was granted with respect to the evidence addressed in the 26 May 2020 notice.

The Government introduced the entirety of Appellant's messages with "Kittycat." Her initial Whisper post asked, "Who goes to Ramstein High School?" Appellant responded on 11 February 2019 by asking "Kittycat," "You know what I like about high school girls?" After "Kittycat" responded, "What," Appellant replied, "I keep getting older and they stay the same age [laughing emoji]." Appellant then asked if "Kittycat" was "into guys older than [her]." After "Kittycat" informed Appellant she was 15 years old and a sophomore in

high school, Appellant continued to exchange messages with her. When Appellant told "Kittycat" he was curious what she looked like, she sent him an actual clothed photo of her upper torso and head. Appellant told "Kittycat" she was "cute" and looked 17 or 18 years old rather than 15. Appellant then sent "Kittycat" the "pick a number game" and invited her to play with him. When "Kittycat" responded "Eh" and told him she had a boyfriend, Appellant responded, "It's ok, it's an chat on whisper. He won't know," and then sent her the same photo of himself sitting in a car that he had sent "Sara." Appellant asked "Kittycat" if her boyfriend was in Germany, to which she replied, "Yes." Appellant then responded, "Right on, [ ] What are you doing on whisper?" The following afternoon, 12 February 2019, Appellant attempted to reinitiate contact with "Kittycat," asking, "Hey how are you?" which was the last message.

AFOSI agents apprehended Appellant the following day.

**2. Law**

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, proving intent or the existence of a plan. Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989). "When the defense of entrapment is raised, evidence of uncharged misconduct by the accused of a nature similar to that charged is admissible to show predisposition." R.C.M. 916(g), Discussion (citing Mil. R. Evid. 404(b)). We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b): (1) does the evidence "reasonably support a finding" that the accused committed the prior crime, wrong, or act; (2) what "fact of . . . consequence is made more or less probable" by the proffered evidence; and (3) is the "probative value . . . substantially outweighed by the danger of unfair prejudice?" *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989) (alterations in original) (internal quotation marks and citations omitted).

Mil. R. Evid. 403 provides that evidence that is relevant and otherwise admissible may be excluded if its probative value is substantially outweighed by the danger of, *inter alia*, unfair prejudice or confusion of the issues.

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to

the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "If the military judge fails to place his findings and analysis on the record, less deference will be accorded." *United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014).

### 3. Analysis

Appellant contends the military judge abused his discretion both by permitting the Government to introduce evidence that Appellant communicated on Whisper with "Kittycat," who told Appellant she was 15 years old and was in fact 15 years old, as well as by permitting the Government to introduce the actual messages themselves. As an initial matter, Appellant correctly notes that neither the military judge's initial oral ruling nor his supplemental written ruling addressed the content of Appellant's communications with "Kittycat" beyond the fact that she told Appellant her age; therefore, the military judge's decision to admit the actual communications is afforded less deference. Accordingly, we analyze the two prongs of Appellant's argument separately.

### a. Evidence that Appellant Communicated with "Kittycat"

First, Appellant contends the military judge's findings of fact are not supported by the record. We disagree. The relevant finding of fact, as stated in the written ruling, was that "[t]he search of [Appellant's] cellular phone revealed Whisper chat messages between [Appellant] and a user identified as '[K]ittycat' who told [Appellant] she was fifteen and that this user was later identified as a fifteen[-]year-old Ramstein Air Base high school student." The ruling further stated the military judge "adopted as findings of fact" the "relevant statements" contained in the ROI attached to the Government's response to the defense motion to dismiss. Although the ROI did not include the actual messages between Appellant and "Kittycat," it did include sufficient information regarding what the AFOSI obtained from Appellant's phone and learned about "Kittycat" to support the military judge's finding of fact.

Appellant next argues that the evidence that Appellant communicated with "Kittycat" does not make a fact of consequence to the trial more or less probable. He cites the comment in the AFOSI report that "[Appellant] did not discuss sexual information or share inappropriate photos with ['Kittycat']." Appellant also cites *United States v. Morrison* for the principle that "uncharged acts must be almost identical to the charged acts to be admissible as evidence of a plan or scheme." 52 M.J. 117, 122 (C.A.A.F. 1999) (internal quotation marks and citations omitted). Yet Appellant's conduct with "Kittycat," so far as it went, was extremely similar to his conduct with "Sara." In both cases, Appellant initiated contact with a female in Appellant's geographic area who had made a Whisper post; in both cases, Appellant carried on the conversation with someone who identified themselves as a child under 16 years old; and Appellant's

contact with "Kittycat" occurred close in time to his communication with "Sara." We find the military judge did not abuse his discretion by concluding this evidence was admissible as some evidence of a scheme or plan on Appellant's part to "initiate sexual conversations with other Whisper users" under the age of 16 years.[9]

For similar reasons, contrary to Appellant's argument, we find this evidence also met the lower standard for evidence relevant to Appellant's intent—that the "wrongs or acts need only be similar to the offense charged and not too remote therefrom." *United States v. Woodyard*, 16 M.J. 715, 718 (A.F.C.M.R. 1983) (footnote and citation omitted). As explained above, Appellant's actions with "Kittycat" were very similar to his actions with "Sara," so far as they went, and close in time with them. Appellant argues the ROI does not indicate the date or month when Appellant's communications with "Kittycat" took place. However, the ROI does include interview summaries that indicate "Kittycat" moved to Germany in the fall of 2018, which would support the military judge's determination that "Kittycat's" contact with Appellant must have been sufficiently close in time to the charged conduct to be relevant.

Appellant does not address the military judge's ruling that this evidence would be admissible to rebut a defense of entrapment, and we find no abuse of discretion in that respect. The fact that Appellant knowingly communicated with an actual 15-year-old child on Whisper regarding sexual matters was strong evidence that he was predisposed to engage in indecent sexual conversations with children under the age of 16 years, and was not lured into doing so by an extraordinary inducement. *See Whittle*, 34 M.J. at 208; Mil. R. Evid. 405(b) (allowing "character or [a] character trait [that] is an essential element" of a claim or defense to be "proved by relevant specific instances of the person's conduct"); *see also United States v. Schelkle*, 47 M.J. 110, 112 (C.A.A.F. 1997) ("Character might be an element of a defense if entrapment is claimed and the [G]overnment wants to prove predisposition.").

The military judge included his balancing of the probative value of the evidence against the danger of unfair prejudice, and accordingly his determination is entitled to greater deference. The military judge explained the probative value was "not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." The military judge further explained:

---

[9] Assuming *arguendo* the military judge did abuse his discretion by admitting evidence Appellant communicated with "Kittycat" as evidence of a scheme or plan, we find such an error did not materially prejudice Appellant's substantial rights.

> Specifically, presenting this evidence will take very little addi-
> tional time as the [G]overnment was already going to call the
> law enforcement agent to testify regarding [Appellant's] use of
> Whisper and this portion of their testimony will not take a sig-
> nificant period of time, the evidence is not cumulative as to any
> other evidence, and the danger of unfair prejudice to [Appellant]
> is minimal given the nature of the charged misconduct.

We find no abuse of discretion in the military judge's balancing of the relevant
factors. Accordingly, we find the military judge did not err in admitting evi-
dence to the effect that Appellant communicated on Whisper with a 15-year-
old female Ramstein High School student who identified herself as such.

### b. Specific Communications between Appellant and "Kittycat"

As indicated above, the military judge's rulings did not specifically address
the actual communications between Appellant and "Kittycat," and our review
of the admission of this evidence calls for a less deferential standard. However,
even reviewing the military judge's action de novo, we find no error in the ad-
mission of this evidence.

First, the messages introduced through an AFOSI digital forensic consult-
ant, SA JB, reasonably support a finding that Appellant engaged in the as-
serted communications with "Kittycat" on Whisper. In addition, the substance
of the messages were relevant for reasons similar to those articulated above.
The Defense's cross-examination of SA MN implicated the defense of entrap-
ment and attempted to raise doubt that Appellant believed "Sara" was 13 years
old. Therefore, evidence of Appellant's Whisper communications with "Kit-
tycat" depicting a similar pattern of behavior—including attempting to initiate
the same "game" involving sexually oriented questions—with another self-
identified girl under 16 years of age became relevant evidence of Appellant's
intent and predisposition to engage in such behavior. The fact that Appellant
was not able to progress as far with "Kittycat" as he was with "Sara" due to
"Kittycat's" reluctance or disinterest does not eliminate the relevance of Appel-
lant's behavior.

We further find the probative value of these messages was not substan-
tially outweighed by the danger of unfair prejudice—for reasons similar to
those articulated by the military judge with respect to the general evidence
that Appellant had communicated with the 15-year-old "Kittycat" on Whisper.
Introducing the messages did not require additional witnesses or involve sig-
nificant confusion or delay. Although the "Kittycat" communications were cer-
tainly damaging to the Defense, they were not *unfairly* prejudicial. To the ex-
tent those messages tended to indicate a pattern of behavior, intent, or predis-

position to engage in sexual communications with underage girls, that was exactly why they were relevant to the court members' deliberations as to Appellant's intent and the defense of entrapment as to the charged offenses.

## D. Digital Forensic Expert Testimony

### 1. Additional Background

At trial, the Government intended to call SA JB, the AFOSI digital forensic consultant stationed in Germany who created multiple reports based on the data extracted from Appellant's phone. Before SA JB testified, the Defense raised an oral objection and asked to voir dire the witness "for the purposes . . . of a *Melendez-Diaz* type issue."[10] The military judge agreed to permit counsel to voir dire SA JB.

In SA JB's testimony for purposes of the defense objection, he explained that another AFOSI agent, SA DF, performed the actual extraction of data from Appellant's phone. SA JB was not present when SA DF extracted the data, but SA JB later analyzed the extraction—which he referred to as a "dot-TAR file"—to generate his report. When the military judge asked SA JB what SA DF had told him about the data, the following colloquies ensued:

> [SA JB:] Well, he provided me a report, as well as all his notes. I don't recall if I was -- I don't believe I was there for him to do the extraction, like I said earlier, but I was intimately familiar with what he found, the Whisper messages, other stuff that were Whisper messages that were concerning to us, possibly another underage person and things of the sort.
>
> [Military Judge:] And is there anything from that report that [SA DF] produced that you then kind of adopted and put into your report?
>
> [SA JB:] I can't say for sure, Your Honor, but I don't believe so.
>
> . . . .
>
> [Circuit Trial Counsel (CTC):] The reports that we intended to introduce at trial today, those are reports that you created within the last few days, within the last week?
>
> [SA JB:] Yes, sir. But they're from the TAR file. They're not from any of [SA DF's] analysis or anything like that. It's basically straight from the archive of the phone.

---

[10] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).

> [CTC:] So they're -- it's your independent analysis . . . based on the machine generated TAR file?
>
> [SA JB:] Yes, yeah.
>
> . . . .
>
> [CTC:] Did [SA DF] in any way contribute to the creation of the reports that we intend to offer at trial?
>
> [SA JB:] No.

In response to additional questioning by the military judge, SA JB reiterated that although his report was based on data extracted by SA DF, he did not rely on SA DF's report when he generated his own report.

After SA JB was excused, the military judge instructed the parties to provide written briefs on the issue that night. The Defense subsequently filed a written motion to exclude SA JB's testimony regarding his analysis of the data extracted by SA DF. Essentially, the Defense argued that by calling SA JB rather than SA DF, who performed the actual extraction, the Government would violate the Confrontation Clause of the Sixth Amendment under *Crawford v. Washington*, 541 U.S. 36 (2004). The Government evidently did not provide a written brief.

At the outset of the next day of trial, the military judge provided a written ruling denying the Defense's motion and objection, and read his analysis and conclusion on the record. The military judge explained that the machine-generated data itself was not testimonial and therefore did not implicate the Confrontation Clause. He further explained:

> [T]estimony of [ ] SA [JB] does not and will not violate [Appellant]'s right to confrontation. . . . SA [JB's] personal knowledge regarding the derivation of the evidence at issue made him neither a "surrogate" expert nor a mere "conduit" for the testimonial statements of another. . . . [SA JB] also personally conducted an independent analysis, without relying upon SA [DF's] prior reports and formulated his own carefully considered conclusions and report. All of the data underlying his opinion was not testimonial, and, assuming *arguendo* that [ ] any prior report or conversation with SA [DF] was testimonial, there is no evidence before this [c]ourt that SA [JB] acted as a mere conduit for the report.
>
> [T]estimony by SA [JB] regarding his own analysis of the extraction of [Appellant]'s cell phone is testimonial . . . . This testimo-

nial hearsay, however, satisfies the Confrontation Clause because the declarant of that hearsay, SA [JB], will be subject to cross-examination at trial.

SA JB was subsequently called and testified as an expert in digital forensics regarding his analysis of the data extracted from Appellant's phone.

**2. Law**

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59.

"[A] statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *United States v. Sweeney*, 70 M.J. 296, 301 (C.A.A.F. 2011) (quoting *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F. 2010)). "[M]achine-generated data and printouts are not statements and thus not hearsay -- machines are not declarants -- and such data is therefore not 'testimonial.'" *United States v. Blazier*, 69 M.J. 218, 224 (C.A.A.F. 2010) (citations omitted). Chain of custody documents may also be non-testimonial. *United States v. Tearman*, 72 M.J. 54, 59 (C.A.A.F. 2013).

"[A]n expert witness may review and rely upon the work of others, including laboratory testing conducted by others, so long as they reach their own opinions in conformance with evidentiary rules regarding expert opinions." *Blazier*, 69 M.J. at 224 (citations omitted). "An expert witness need not necessarily have personally performed a forensic test in order to review and interpret the results and data of that test." *Id.* at 224–25 (citations omitted). "That an expert did not personally perform the tests upon which his opinion is based . . . goes to the weight, rather than to the admissibility, of that expert's opinion." *Id.* at 225 (citation omitted). However, an expert witness may not circumvent the rules of evidence and Sixth Amendment by acting "as a conduit for *repeating* testimonial hearsay." *Id.* (citation omitted).

We review a military judge's ruling on a motion to exclude evidence for an abuse of discretion. *United States v. Katso*, 74 M.J. 273, 278 (C.A.A.F. 2015) (citation omitted). Whether a statement is testimonial for purposes of the Sixth Amendment is a question of law we review de novo. *United States v. Baas*, 80 M.J. 114, 120 (C.A.A.F. 2020) (citation omitted).

### 3. Analysis

Appellant contends the military judge abused his discretion in admitting SA JB's testimony because his findings of fact were not supported by the record. Appellant argues that, contrary to the military judge's findings, SA JB's analysis of the extraction relied on testimonial hearsay as well as machine-generated data, and the military judge should have excluded it. We disagree.[11]

Appellant first contends the military judge erroneously states in his findings of fact, "SA [DF] seized the accused's phone before conducting the extraction." As the Government concedes, this finding is not supported by the record in that a different agent actually seized the phone before SA DF performed the extraction. However, this error was immaterial to the military judge's analysis. The salient point for purposes of the military judge's ruling was not the identity of the agent who initially seized the phone, but the fact that SA JB relied on the extraction performed by SA DF. Evidence regarding the chain of custody preceding that point goes to the weight of SA JB's testimony, not its admissibility. *See Blazier*, 69 M.J. at 225. Thus, although Appellant correctly identified an error in the military judge's findings, that error did not render the admission of SA JB's testimony an abuse of discretion.

Appellant next asserts the military judge erred in finding SA JB did not rely on SA DF's analysis, citing SA JB's testimony that he received a report and notes from SA DF. We disagree. SA JB's subsequent clarifications that his own report was the product of his independent analysis of the extraction, and that he did not rely upon SA DF or SA DF's report "in any way," was more than adequate to support the military judge's conclusion. *See United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (stating a military judge's findings of fact are reviewed for clear error).

Because Appellant fails to demonstrate the military judge clearly erred in finding SA JB did not rely on any testimonial hearsay from SA DF, his argument that SA JB's testimony violated the Confrontation Clause also fails.

### E. Unanimous Verdict

#### 1. Additional Background

Before trial, the Defense moved the military judge "to require a unanimous verdict for any finding of guilty," or, in the alternative, to "provide an instruction that the President must announce whether any finding of guilty was or was not the result of a unanimous vote without stating any numbers or names."

---

[11] The Government asserts trial defense counsel affirmatively waived this issue at an earlier point in the trial. We find the record does not support the Government's assertion.

The Defense asserted that in light of the Supreme Court's decision in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Sixth Amendment, the Fifth Amendment's Due Process Clause, and the Fifth Amendment right to equal protection all required a unanimous verdict in trials by court-martial with court members. The Government opposed the motion, asserting that binding precedent from the Supreme Court and the CAAF held that the Sixth Amendment right to a jury trial did not apply to courts-martial; citing several unpublished opinions of this court holding that Fifth Amendment due process does not require unanimous court-martial verdicts; and asserting the right to a unanimous verdict was not a "fundamental right" that would implicate Fifth Amendment equal protection, and if it did, Congress's statutory provision for non-unanimous verdicts in courts-martial would pass judicial scrutiny.

The military judge denied the motion in a written ruling which he supplemented after the court-martial adjourned. He found *Ramos* neither explicitly nor implicitly overruled prior Supreme Court and CAAF precedent holding that the Sixth Amendment right to a jury trial did not apply to courts-martial. He further found any due process considerations weighing in favor of unanimous verdicts were not "so extraordinarily weighty as to overcome the balance struck by Congress" in Article 52, UCMJ, 10 U.S.C. § 852, in light of the "specific military conditions" favoring finality of verdicts and the avoidance of unlawful command influence. He further explained that a unanimous verdict in a jury trial was not a fundamental right guaranteed in a court-martial because the right to a jury trial did not apply to court-martial panels; moreover, he agreed with the Government that even if such a fundamental right did apply, Congress's provision for non-unanimous verdicts would survive either rational basis review or heightened scrutiny by the courts.

The court members convicted Appellant of two specifications of attempted sexual abuse of a child on divers occasions in violation of Article 80, UCMJ, as described above. The vote of the court members was not disclosed.

### 2. Law

Article I, Section 8 of the Constitution provides, "The Congress shall have Power . . . To make Rules for the Government and Regulation of the land and naval Forces." "[J]udicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Solorio v. United States*, 483 U.S. 435, 447 (1987) (second alteration in original) (internal quotation marks and citations omitted); *cf. Loving v. United States*, 517 U.S. 748, 768 (1996) ("[W]e give Congress the highest deference in ordering military affairs.").

Article 52, UCMJ, 10 U.S.C. § 852, provides, "No person may be convicted of an offense in a general or special court-martial, other than . . . in a court-martial with members . . . by the concurrence of at least three-fourths of the members present when the vote is taken."

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." However, "'constitutional rights may apply differently to members of the armed forces than they do to civilians.'" *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012) (quoting *United States v. Marcum*, 60 M.J. 198, 205 (C.A.A.F. 2004)). "[T]here is no Sixth Amendment right to trial by jury in courts-martial." *Id.* (citing *Ex parte Quirin*, 317 U.S. 1, 39 (1942); *United States v. Wiesen*, 57 M.J. 48, 50 (C.A.A.F. 2002) (per curiam)); *see also Whelchel v. McDonald*, 340 U.S. 122, 127 (1950); *United States v. Begani*, 81 M.J. 273, 280 n.2 (C.A.A.F. 2021); *United States v. Riesbeck*, 77 M.J. 154, 162 (C.A.A.F. 2018).

"Congress, of course, is subject to the requirements of the Due Process Clause when legislating in the area of military affairs, and that Clause provides some measure of protection to defendants in military proceedings." *Weiss v. United States*, 510 U.S. 163, 176 (1994) (citations omitted). However, "in determining what process is due, courts must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces . . . ." *Id.* at 177 (internal quotation marks and citations omitted). Where the Supreme Court has "faced a due process challenge to a facet of the military justice system," it has asked whether the factors militating in favor of the asserted due process right "'are so extraordinarily weighty as to overcome the balance struck by Congress.'" *Id.* at 177–78 (quoting *Middendorf v. Henry*, 425 U.S. 25, 44 (1976)).

Equal protection "is generally designed to ensure that the Government treats similar persons in a similar manner." *United States v. Gray*, 51 M.J. 1, 22 (C.A.A.F. 1999) (internal quotation marks and citation omitted).

> For the Government to make distinctions does not violate equal protection guarantees unless constitutionally suspect classifications like race, religion, or national origin are utilized or unless there is an encroachment on fundamental constitutional rights like freedom of speech or of peaceful assembly. The only requirement is that reasonable grounds exist for the classification used.

*Id.* at 22–23 (quoting *United States v. Means*, 10 M.J. 162, 165 (C.M.A. 1981)) (additional citations omitted).

"An 'equal protection violation' is discrimination that is so unjustifiable as to violate due process." *United States v. Akbar*, 74 M.J. 364, 406 (C.A.A.F. 2015)

(quoting *United States v. Rodriguez-Amy*, 19 M.J. 177, 178 (C.M.A. 1985)). However, an accused servicemember is "not similarly situated to a civilian defendant." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 743 (1974)). Fundamental rights "are only fundamental to the extent (and to the persons to whom) the Constitution grants them in the first place." *United States v. Begani*, 79 M.J. 767, 776 (N.M. Ct. Crim. App. 2020), *aff'd*, 81 M.J. 273 (C.A.A.F. 2021).

"When no suspect class or fundamental right is involved, . . . the [Supreme] Court requires only a demonstration of a rational basis as support for the law." *United States v. Wright*, 48 M.J. 896, 901 (A.F. Ct. Crim. App. 1998) (citing *Romer v. Evans*, 517 U.S. 620 (1996)). "Under the rational basis test, the burden is on the appellant to demonstrate that there is no rational basis for the rule he is challenging. The proponent of the classification 'has no obligation to produce evidence to sustain the rationality of a statutory classification.'" *United States v. Paulk*, 66 M.J. 641, 643 (A.F. Ct. Crim. App. 2008) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). "As long as there is a plausible reason for the law, a court will assume a rational reason exists for its enactment and not overturn it." *Id.* (citing *Heller*, 509 U.S. at 320; *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938)).

Under the doctrine of vertical stare decisis, courts must strictly follow the decisions issued by higher courts. *United States v. Andrews*, 77 M.J. 393, 399 (C.A.A.F. 2018) (citation omitted). "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

### 3. Analysis

On appeal, Appellant reasserts that in light of *Ramos* the Sixth Amendment and the Fifth Amendment rights to due process and equal protection all required a unanimous verdict by the court-martial panel in order to convict him of any offense. We are not persuaded.

In *Ramos*, the Court overruled its prior decisions in *Apodaca v. Oregon*, 406 U.S. 404 (1972), and *Johnson v. Louisiana*, 406 U.S. 356 (1972), to hold that the Sixth Amendment's guarantee of the right to trial "by an impartial jury" required a unanimous verdict in state as well as federal criminal trials. *Ramos*, 140 S. Ct. at 1396–97. However, the essence of the Court's opinion is to explain that the jury required by the Sixth Amendment is one that renders a unanimous verdict. *Ramos* does not purport, explicitly or implicitly, to extend the *scope* of the Sixth Amendment right to a jury trial to courts-martial; nor does the majority opinion in *Ramos* refer to courts-martial at all. Accordingly, after *Ramos*, this court remains bound by the plain and longstanding precedent from

our superior courts that the Sixth Amendment right to a jury trial does not apply to trial by courts-martial—and, by extension, neither does the unanimity requirement announced in *Ramos*.[12]

Appellant's due process argument is equally unavailing. This court has repeatedly held that Fifth Amendment due process does not require unanimous verdicts in courts-martial. *See, e.g.*, *United States v. Canada*, No. ACM S32298, 2016 CCA LEXIS 610, at *34 (A.F. Ct. Crim. App. 20 Oct. 2016) (unpub. op.), *aff'd on other grounds*, 76 M.J. 127 (C.A.A.F. 2017); *United States v. Spear*, No. ACM 38537, 2015 CCA LEXIS 310, at *9 (A.F. Ct. Crim. App. 30 Jul. 2015) (unpub. op.); *United States v. Daniel*, No. ACM 38322, 2014 CCA LEXIS 224, at *7–10 (A.F. Ct. Crim. App. 1 Apr. 2014) (unpub. op.), *aff'd*, 73 M.J. 473 (C.A.A.F. 2014). We are similarly unconvinced that the factors weighing in favor of a heretofore unrecognized unanimity requirement in courts-martial are so extraordinarily weighty as to override Congress's determination that a three-fourths vote strikes the correct balance of competing considerations in the administration of military justice, potentially including the prevention of unlawful command influence and securing finality of verdicts.[13]

Finally, we find no equal protection violation either. The non-unanimity requirement of Article 52, UCMJ, does not implicate a suspect classification. Furthermore, a servicemember standing trial in a court-martial is not similarly situated to a civilian accused in this respect, and the unanimity requirement announced in *Ramos* is not a "fundamental right" afforded to the former.

---

[12] We recognize that, as Appellant notes, several rights guaranteed by the Sixth Amendment have been applied to courts-martial. *See, e.g.*, *United States v. Danylo*, 73 M.J. 183, 186 (C.A.A.F. 2014) (speedy trial); *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (notice); *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011) (effective counsel); *Blazier*, 69 M.J. at 222 (confrontation); *United States v. Hershey*, 20 M.J. 433, 435 (C.M.A. 1985) (public trial). However, Appellant has not drawn our attention to any case in which a Sixth Amendment right has been found applicable to trial by courts-martial *in direct contradiction* to express statutory language enacted by Congress pursuant to its Article I, Section 8 authority to makes rules for the government of the land and naval forces. Rather, the CAAF has found Sixth Amendment guarantees applicable where they are also consistent with the statutory regime Congress enacted. In contrast, in the instant case Appellant would have us, in effect, declare Article 52, UCMJ, unconstitutional, notwithstanding Article I, Section 8.

[13] *Cf. United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17 (1955):

> [I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. But trial of soldiers to maintain discipline is merely incidental to an army's primary fighting function. To the extent that those responsible for performance of this primary function are diverted from it by the necessity of trying cases, the basic fighting purpose of armies is not served.

As described above, *Ramos* established that the jury trial guaranteed by the Sixth Amendment requires a unanimous verdict, but it did not purport to expand the scope of the Sixth Amendment jury trial right to servicemembers tried by courts-martial. To the extent Article 52, UCMJ, is therefore subject to rational basis review, we find Appellant has failed to meet his burden to demonstrate no plausible rational reason exists for the three-fourths provision; therefore, we find no cause to overturn it. *See Paulk*, 66 M.J. at 643.

## F. Convening Authority's Failure to Take Action

### 1. Additional Background

The offenses of which Appellant was convicted occurred between on or about 11 December 2018 and on or about 13 February 2019. The convening authority referred the charges and specifications on 28 January 2020 for trial by a general court-martial. The court-martial concluded on 3 June 2020, and the military judge signed the Statement of Trial Results on the same day.

On 12 June 2020, Appellant submitted a request that the convening authority defer his adjudged confinement and reduction in grade, and the automatic forfeitures, until the military judge entered the judgment of the court-martial. *See* 10 U.S.C. § 857(b)(1). In addition, Appellant requested the convening authority waive his automatic forfeitures for a period of six months, his release from confinement, or the expiration of his term of service, whichever occurred first, for the benefit of his wife and dependent child. *See* 10 U.S.C. § 858b(b). Appellant did not request a reduction in his sentence pursuant to R.C.M. 1106.

On 4 August 2020, the convening authority signed a Decision on Action memorandum wherein he stated he took "no action" on the findings or the sentence in Appellant's case. The convening authority further stated that he granted the requested deferment of the reduction in grade and automatic forfeitures, and that he also granted the waiver of automatic forfeitures in order "to maximize the financial benefit to [Appellant's] dependents." However, the convening authority denied the request to defer Appellant's confinement; he did not provide a reason for the denial.[14]

---

[14] Although not raised by Appellant, we note the convening authority erred by failing to state the reasons why he denied Appellant's request to defer confinement. *See United States v. Sloan*, 35 M.J. 4, 7 (C.M.A. 1992), *overruled on other grounds by United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018); *see also* R.C.M. 1103(d)(2) (stating decisions on deferment requests are subject to judicial review for abuse of discretion). We further note Appellant did not object to the convening authority's failure to state the reasons for denying the request. *See* R.C.M. 1104(b) (permitting parties to

On 21 August 2020, the military judge signed the entry of judgment. Appellant did not object to the convening authority's decision on action or to any other aspect of the post-trial process prior to submitting his assignments of error to this court. *See* R.C.M. 1104(b) (governing post-trial motions).

**2. Law**

> [I]n any court-martial where an accused is found guilty of at least one specification involving an offense that was committed before January 1, 2019, a convening authority errs if he fails to take one of the following post-trial actions: approve, disapprove, commute, or suspend the sentence of the court-martial in whole or in part.

*United States v. Brubaker-Escobar*, 81 M.J. 471, 472 (C.A.A.F. 2021) (per curiam); *see also* Article 60, UCMJ, 10 U.S.C. § 860 (2016 *MCM*). The convening authority's failure to explicitly take one of those actions is a "procedural" error. *Brubaker-Escobar*, 81 M.J. at 475. "Pursuant to Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2018), procedural errors are 'test[ed] for material prejudice to a substantial right to determine whether relief is warranted.'" *Id.* (alteration in original) (quoting *United States v. Alexander*, 61 M.J. 266, 269 (C.A.A.F. 2005)).

**3. Analysis**

Appellant requests that we remand the record in order for the convening authority to take action on the sentence as Article 60, UCMJ, required him to do. However, Appellant—who submitted his assignment of error on this issue before the CAAF issued its opinion in *Brubaker-Escobar* quoted above—does not allege that he was prejudiced by the convening authority's failure to take action on the sentence. Instead, Appellant reviews several unpublished opinions of this court that pre-date *Brubaker-Escobar*, in which various panels reached conflicting conclusions as to whether the convening authority's failure to take action on the entire sentence was an error and, if so, under what circumstances corrective action was required.[15] Relying particularly on *United*

---

file post-trial motions to address various matters, including errors in post-trial processing). Reviewing for plain error, under the circumstances of this case, we find the omission did not materially prejudice Appellant's substantial rights. *See United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (citations omitted).

[15] *See United States v. Lopez*, No. ACM S32597, 2020 CCA LEXIS 439, at *9 (A.F. Ct. Crim. App. 8 Dec. 2020) (unpub. op.); *United States v. Aumont*, No. ACM 39673, 2020 CCA LEXIS 416 (A.F. Ct. Crim. App. 20 Nov. 2020) (en banc) (unpub. op.); *United States v. Barrick*, No. ACM S32579, 2020 CCA LEXIS 346, at *3–5 (A.F. Ct. Crim. App. 30 Sep. 2020) (unpub. op.); *United States v. Finco*, No. ACM S32603, 2020 CCA LEXIS 246, at *11–17 (A.F. Ct. Crim. App. 27 Jul. 2020) (unpub. op.), *rev. denied*, ___ M.J. ___, 2022 CAAF LEXIS 168 (C.A.A.F. 3 Mar. 2022).

*States v. Lopez*, No. ACM S32597, 2020 CCA LEXIS 439, at *9 (A.F. Ct. Crim. App. 8 Dec. 2020) (unpub. op.), *rev. denied*, ___ M.J. ___, 2021 CAAF LEXIS 978 (C.A.A.F. 9 Nov. 2021), and *United States v. Finco*, No. ACM S32603, 2020 CCA LEXIS 246, at *11–17 (A.F. Ct. Crim. App. 27 Jul. 2020) (unpub. op.), *rev. denied*, ___ M.J. ___, 2022 CAAF LEXIS 168 (C.A.A.F. 3 Mar. 2022), Appellant contends Article 60, UCMJ, "must be scrupulously honored" and that action on the sentence is required.

However, in light of *Brubaker-Escobar*, the convening authority's failure to take action on the sentence was a non-jurisdictional procedural error to be tested for material prejudice. We find no such prejudice to Appellant's substantial rights in this case. The convening authority was not authorized to disapprove, commute, or suspend Appellant's adjudged bad-conduct discharge or term of confinement. *See* 10 U.S.C. § 860(c)(4) (2016 *MCM*). The convening authority did have power to disapprove, commute, or suspend Appellant's adjudged reduction in grade, *see* Article 60(c)(2)(B) and (c)(4), UCMJ, 10 U.S.C. § 860(c)(2)(B), (c)(4); however, Appellant requested no such relief. Considering the totality of the circumstances, including Appellant's failure to identify specific prejudice, the sentence imposed, the absence of any request for clemency with respect to the sentence (as opposed to deferment or waiver), the convening authority's limited ability to modify the sentence, and the nature and seriousness of the offenses of which Appellant was convicted, we find no material prejudice to Appellant's substantial rights by the convening authority's failure to take action on the sentence.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court